Case 14-3347 Kehoe Component Sales Inc v. Best Lighting Products Inc Oil argument not to exceed 15 minutes per side. Mr. Hall for the appellants when you're ready to proceed. Good morning, Your Honor. I'm pleased to court, and we'll all appear in here for the appellants. I would like to reserve two minutes for rebuttals. Very well. Your Honor, the decisions of the court below and our briefs to this court present a complicated array of issues, and we have addressed these issues individually in our briefs. There are two issues which permeated the trial, however, and are recurrent themes in the district court's decisions. First was that Best Lighting originated or created the products it subsequently purchased from Pace. Pace was prepared to challenge Best Lighting by showing that the products were not original with Best and were copies of products originated by others and copied by Best. Pace was precluded from presenting this evidence in a manner which we believe was contrary to Federal Rules of Civil Procedure 37 and denied Pace a fair trial. Second was the finding that Best Lighting owned all of the tooling or molds that Pace used to make components for the products it assembled and sold to Best Lighting. With the exception of one sale of tooling to Best Lighting documented by a tooling charge, Best provided only vague and incomplete details of an alleged oral agreement, which fell very far short of the level of detail required to prove the existence of an oral contract for the purchase of that tooling from Pace. However, the court made a finding that Best Lighting owned all of this tooling and its findings appeared again and again throughout its decision and appeared to tip the scales against Pace on contract, the Lanham Act, and interference with business relations. On specific issues of law, the District Court believed erred on the statute of limitations relating to the Ohio Uniform Trade Secrets Act, the statute of limitations under the Lanham Act, the essential elements of Best Lighting's claim for reverse pawning off, amending the complaint sua sponte with regard to warranty issues, applying implied warranties for defective products to products that were not defective, ruling that Pace had forfeited its molders lien, which it had recognized, finding that Alvin Katz's know-how qualified under the Trade Secrets Act as trade secret, interpreting a prohibition on sales in the party's agreement to include delivery of goods under pre-existing contracts, interpreting the assignment clause of the agreement as a prohibition on copying any of Best Lighting's products, and assessing damages for tortious interference with business relations in a manner which we believe is contrary to Ohio law. We also raised issues regarding the award of punitive damages and the awarding of returning fees as to whether either was justified under the Lanham Act or the Ohio Trade Secrets Act. I'm not sure, just from a basic contracts point of view, how you challenge the finding that Pace could, under the contract, fulfill Best's orders and then make a few extras on the side of the product for themselves and sell to Best customers. Is that really a justifiable proposition that Pace can argue under any theory? It would be like Nike, the contractor or manufacturer of tennis shoes. The person manufactures those and then makes several runs for itself and puts the Nike label on and sells them to the Nike customer. No, you're right. I believe the difference is that, well, I'm going to take the Nike example as one, where their shoes, I believe, would probably be patented. So they would have a patent on those shoes. They would be protecting the intellectual property. Best had no protection over its intellectual property or any intellectual property associated with these goods, which were common, everyday, functional items which are required under building codes throughout the country. They all had the same appearance. They all had the same basic requirements. And Best made a trade threats claim and lost it. And that was not appealed, right? And that was not appealed. So there is no protection. These items can be copied. As this court has held recently in the Ronnevelt case relating to pumps that went with, applied to trucking systems. There is no prohibition on copying if there's no protection. I mean, this would be something that could be protected by contract, but not otherwise at law. But if, in fact, the tubes, the dyes, or whatever, belong exclusively to Best, Best bought the equipment. If you assume that, then the case being entitled to copy them and sell. It's not just a copy, but to compete with Best in Best's own customer market. It seems to me that's part of the problem. Well, I think once you are entitled to make a copy, once a good can be copied, you can sell it to anyone. And the fact that it happens to compete with another party who also markets the same good, I don't think is... We wouldn't be required to go to a different market in another continent or nation, for example. If you're allowed to copy, I think you can sell it to anyone. And I think that's the... there is no prohibition on people you can sell it to. The question you raised about the ownership of the tooling is one that we fought throughout this proceeding. That tooling was purchased by Pace, and no one disputes that. Pace went out and made the contracts to purchase that tooling from third-party vendors. But how about the Big Wash agreement? And that agreement did not Pace assign the rights and ownership of the tooling to Best? And that's what... actually, we conceded to Big Wash. And Big Wash is something that we've argued is actually inconsistent with both the court's ruling. It was an inconsistent position taken by Best throughout these proceedings. The Big Wash related to a specific subset of tooling, which has been identified as being associated with the making of components for approximately 15% of the total book of products. Those products... and those are more or less the outlier products, the ones that have very limited sales. In the Big Wash, Best agreed to wash with a demand for $300,000 against the ownership of those specific tools. And we can see they own those tools. But the remainder of the tooling was purchased by Pace and never transferred to Best. It is Best's argument that they purchased it through this amortization agreement, which was a verbal agreement between Alan Katz and Patrick Keogh. But there was no information to supply the details of that contract, other than saying, oh, I have this amortization contract. Excuse me, in conference, tell me a little bit about whether or not Pace entered into an agreement not to compete with Best. Wasn't there an agreement where they said we won't? Pace did that. The supply agreement limited competition for one year. And Pace's position has been that he did not compete during that year. And the district judge, Swiss-Fonte, amended the claim to allow claims outside the one-year period of the supply agreement, right? He allowed warranty claims. There were goods that Best claimed were defective. And we had complained repeatedly throughout the proceedings that Best had an obligation to identify the claims or defects to goods purchased under the contract. And it never identified the defective goods to the contract. Now, our position is that that would have been a simple matter for them to do. They had the products. They could have checked the date codes within those products. Obviously, any product made in 2007 and 2008 would have been bought by them, pursuant to the supply agreement, and would have been covered by the warranty. They never went to that extent. Instead, they aggregated all of the products that were available, no matter when they might have been purchased, and made a warranty claim based on all of them, including $117,000 worth of products. So how do you try these issues by implying and setting the condition and object to the condition of the evidence? How do you stop it? Your Honor, their evidence wasn't miscible, but it wasn't complete. They needed another – they had another essential element. What they produced was, of course, necessary for them to prove defects, but they needed to go on beyond that and prove that those goods were purchased – those specific goods they were purchasing or claiming defects for were purchased under the contract which supplied the warranty. They never did that, and we raised that issue repeatedly. We raised it at summary judgment. We raised it during the trial. We raised it at the conclusion of the proof. We raised it over and over again. We hardly agreed through any kind of implied consent to that issue. Now the statute of limitations issues, I think, are pretty well laid out in our briefs. In terms of the Lanham Act issue, if you do get to the merits of the Lanham Act claim, where the judge erred was in not – was in finding that they did not need to prove rights in their trade trust. That the goods that were allegedly being falsely designated, that they had rights in those agreements that could be pursued under the Lanham Act, that they were protectable. The judge – the district court concluded that they didn't need to show that because it was a claim for reverse piling off. But I think that line of reasoning was foreclosed by the Supreme Court in its Daystar decision. In that decision, and I'm going to quote just briefly from Justice Scalia's decision, where he says, We concluded, and this was in the case of Wal-Mart versus Samara Brothers, We concluded that designs could not be protected under Section 43A of the Lanham Act without showing that they had acquired secondary meaning. So that they identify the source of the product rather than the product itself. And then he goes on to say, This carefully considered limitation would be entirely pointless if the producer could turn around and pursue a reverse passing off claim under exactly the same provision of the Lanham Act. Right within that, the court builds in a requirement that the essential elements of a reverse piling off claim include establishing that you have a protectable interest in the product. Best lost that claim, which foreclosed their reverse piling off claim. And the only case they've cited subsequent to that, the Waterman case, the GNI Waterman case out of Washington State, actually holds for the proposition that that proof is required. Best, unfortunately, stop reading it after they've talked about reverse piling off directly. But if you continue on in the opinion the judge made regarding the 12b-6 motion, he goes on to talk about non-functionality and secondary meaning and incorporates both of those elements are required for their first claim for reverse piling off. So I believe the Waterman case is exactly on point with the Daystower case. This is an element of reverse piling off, and the court overlooked it. For the rest of our arguments, I will reserve my time for replying and rebuttal, but we also rely on our briefs. Good morning, Your Honor. Good morning. I'm Gregory Barwell from Best Lighting Products, along with my co-counsel, Wen Shimin. Counselors, I would like to address a little bit here that probably is not as clear in the briefs that were provided. Alvin Katz, who started Best Lighting back in 1996, 1995, had over 30 years' experience in emergency lighting business before he started Best Lighting. The reason he went out and started Best Lighting was because the other company on his own with his brother closed up and he needed to do some work, and he needed to support his family and his two sons. He devoted his life savings, dumped it into starting Best Lighting. Do you want some music in the background? No, Your Honor. But he had over 25 years before starting Best Lighting. Katz manufactured his own products in San A.M., California. They manufactured their own products in Korea prior to beginning this manufacturing process for a relationship with Pace Products. During the Pace Products or the Pace relationship, Best Lighting continued to manufacture its own products. Even after the relationship ended in 2008, Best Lighting continued to manufacture its own products. At the beginning of the relationship between Best Lighting and Pace, Pace wasn't manufacturing anything. They didn't manufacture lighting products, emergency exit signs, emergency lights, nothing. They assembled products. That's all they did. Alvin Katz, when he arrived in China to view the Pace factory, there was nothing there. There was no injection mold machines, nothing to go with that, to enable Pace to manufacture these products. Alvin Katz taught at Keto and Pace everything that they know about lighting products, emergency exit signs, through his culmination of, at that time, 31 years of experience. I'd like to address some of the issues that Mr. Hall brought up regarding the tooling that's involved. I think it's important that we look at the big wash that took place back in 2005, which was a dispute between Pace and Best regarding some defective products. At that time, Pace presented Best Lighting with a list of tooling. It was never established during the quarter. The first time I heard today, it was 15 percent of the products. It was an overwhelming number of the products. Pace presented Best Lighting with an invoice at that time that said, here's your invoice for the tooling. Up until 2005, we want you to pay it. However, there was an agreement between Mr. Keto and Mr. Katz that all the other tooling was going to be amortized. The reason why it was amortized is because we had high-run products. It was square exit lighting products that were high-run. Mr. Hall was correct in the fact that Pace purchased the tooling for these high-run products, but Best paid for it. Pace even agreed to that, not only with the testimony of Mr. Keto when he asked what tooling Best Lighting owned. They owned all of it. They also went ahead and admitted that in their answer. The appellant stated that in Pace's reply brief that it was only the tooling for the Big Watch that was involved in their admission. Pace said in their reply brief, page 1516, that Pace was only referencing tooling that Best acquired ownership pursuant to the Big Watch. However, if you go back and you read exactly their answer in document number 121 in the 2008 case, the accurate statement is, pursuant from the supply agreement, is the tooling that is owned. The supply agreement covered the full line of the Best Lighting products. Therefore, Best Lighting owned all of their tooling, whether they purchased it through Big Watch or they purchased it through an amortization agreement between Mr. Keto and Mr. Katz. The issue regarding the competition involved with these companies. There was not an actual written contract until January of 2007 that Pace would sign all the designs, intellectual property, and derivations of all the products to Best Lighting. It was going to be an end-all, be-all agreement that there was no more confusion over who owns the products, who owns the tooling, and who owns the designs. Also, this is a supply agreement you're talking about? Yes, Your Honor. Okay. That's limited to one year. Yes, Your Honor. There was a question brought up of whether that limitation, and there was limitations within that contract that had specific time periods. There was not any limitation regarding the designs, the tooling, and the products that actually belonged to Best Lighting. Pace had no idea what products to go ahead and manufacture. Alvin Katz would bring his product, and he had several other manufacturers that he was utilizing as well. Pace was just not the only one. Pace was the only one that took Best Lighting's product, slapped their own name on it, put it in a box that was identical to Best Lighting's. Did Pace slap their name on these Lighting products? Yes, Your Honor. Okay. They slapped their name on them, not Best's name. That's the Lighting Act claim. There was no misrepresentation here that these were Pace products as opposed to Best products, and that's really what you need. Did they misrepresent the source of these products? Yes, they did, Your Honor. There were several products that the current CEO, Don Smith, testified to. They were presented in court, and they were the Best Lighting products with a Best Lighting product number and a Pace name on it. So how would that confuse a customer? Isn't the Lighting Act customer-oriented to eliminate confusion by the customer as to the origin of these products? How would the customer be confused when the product says it's Pace on it? Why would the customer think it's actually a Best product? Because of having the Pace name on the product. They don't think it's a Best product? I'm sorry? So would it be identifiable by the fact that you said it had the Best number with the Pace name? And so Judge Griffin's question is, under the Lighting Act, you've got Stephanie Hogan on it. It's going to create the likelihood of confusion. And since there is the Pace name and the Best number, how is that going to be confusing the customer? That's the question. There is a Pace name on the product itself utilizing the Best Lighting product number. That was a series of products at that point. There's another series of products that are devoid of any of the Best Lighting's name identification numbers because what was happening is— Can you just answer a question? How is that confusing the customer when it says Pace on it? Because Pace is representing that product to be their own. I know, but that's what it actually is. Well, other than you claim it to be their own. How does that confuse the customer? Because the customer—well, there was actually confusion supplying it because the customer would end up taking this Pace product and sending them back to the Best Lighting. The customer had no idea of the origin of that product. And they were sending it back to Best because of the number? Because these products were always originated by Best Lighting. Best Lighting created the market for these products. They were inserted into the stream of commerce under Best Lighting. Pace began to infiltrate or bring these products in starting back in 2006 to 2007 and selling them to customers other than Best Lighting. But the industry understood that these products culminated from Best Lighting. The industry didn't? I mean, don't we look for the consumer then? Yes, and again, the industry of emergency exit lightings is very small because it culminates through different— I think your claim is really weak, but there's all sorts of claims here. And I don't want to focus right now on the Ohio trade secrets claim. And here I think we have a real problem with the statute of limitations that Judge Sargis, in this bench trial, made findings back. One finding, the fact that he made that we were viewing for a clear error, that was that in August 2004, the e-mail sent in the case established knowledge and actual injury. And Judge Sargis said the clock started with that August 2004 e-mail, the statute of limitations clock. Well, if the clock for the statute of limitations starts August 2004, the counterclaim had to be filed by August 2008 with a four-year statute of limitations in Ohio. And the counterclaim here for Ohio trade secrets is two months late. How do you get past the four-year statute of limitations? Your Honor, the whole issue regarding the trade secret, the know-how that had been bargained and now been passed, the know-how was instituted in each and every product. So each and every product had its own know-how, where to place a switch, how to mount it to the ceiling, how much plastic to use, what circuits to provide, the counterbalance of different batteries that would have to go inside. In 2004, if we look back at the testimony itself, Alan Cass was only communicating to Mr. Kehoe that Pace was communicating with Bessleggings customers. It's not that they were selling Bessleggings products or using Bessleggings know-how. That's the only testimony that goes back to that particular e-mail regarding that. Well, it's a finding of fact made by Judge Sargis that limited it. I think he said that that e-mail shows actual injury to Bess. And he said the statute of limitations starts there. Are you disputing the finding of fact? I'm not disputing the finding of fact. I'm disputing the fact that Pace, upon learning this, if this is one of the statute of limitations that started back in 2004, it would have to start on one particular product. What product was that that they were communicating back to? I don't think that was a ruling by Judge Sargis, was it? It was not limited to one product. But between 2004 – All right, so what you're saying is the finding of fact was – Am I saying that is the finding of fact? Otherwise, you're stuck. What I'm saying is that Pace failed to identify what product, what know-how, at that particular time in 2004, was what started the clock on the statute of limitations. Would you agree with me that the rationale used by Judge Sargis of a continuing violation is not the law in Ohio? I would agree with you that a continuing violation is not the law. And I would say Judge Sargis ruled here, was it not? He did not say that it was a continuing violation. Isn't that implicit in his ruling that this happened again? I guess it was his word that it not only happened once, but it happened again, and therefore the statute of limitations was told. I can read you what he actually ruled, but it's my recollection that's basically what he said. No, Your Honor. Actually, what the court even stated was that Pace went ahead and violated the know-how in 2007. And again – Okay. Again, he did use it later. He had a later date. Well, very – he did so – Your Honor, the only way I read that is that he adopted the continuing report by – because it happened more than once. And we – I mean, I think it's clear in Ohio law that's not the law. I think it can be segregated, Your Honor, because of the trial report Judge Sargis stated later in his opinion. So I did read the same point. Yes, he said it again. He said that Pace misappropriated best-lettings know-how in 2007 when it sold competing products to best-letting customers. Only at that time did we learn that at that time Pace was selling best-lettings customers and using best-letting products. Okay. We knew that in 2004 with email, which – email said that he's aware that there are quotes given by Pace. And on my desk, we were quoting – Please don't quote the guys. I sell. That will break up us for sure. I don't want you to quote in the market. Okay. Maybe not selling, but they were trying to sell products in August 2004. You're right, Your Honor. What were they trying to sell? We don't know what they were trying to sell. Were they trying to sell a best-letting product? Did Pace go out and copy someone else's product? We had no idea what they were selling at that point in time. Well, the only reason best would be conserved is if they're quoting products that are competing with the best products, right? I mean I don't know why best would be conserved if they're not related to best products. Because – well, not the fact that Pace had the full line. They knew exactly, best-lettings customers, what they were paying for the product. Pace had the full insight on that. They could go ahead and attack their customers whatever way they wanted. But again, we had no knowledge of what products at that time were being sold. It wasn't until the grabment of 2009 when the full line of Pace products were delivered that we were able to look at it and determine that each and every one of these products was not just a copy, but they had the same fingerprint of the tool marks that were used on the best-letting tool. I know your time is up, but I've got some other questions. I'm concerned about the ruling by the district judge that the complaint was amended by implication, by failing to object to the evidence. I know we do allow that on occasion when there is an implicit amendment of the complaint by conduct. I'm having trouble seeing how there is an implied consent to expand the complaint. Can you tell me why you think that ruling is correct? I think it's correct, because if we look at the breach of warranty claim, and Pace went ahead and just pulled everything together and said the judge was wrong on a decision for $318,000. Pace was not complaining regarding when we talk about the amended complaint. We're only talking about a specific amount of products that were not within the complaint or under the breach of warranty itself. Pace had full knowledge. Every quarter from when the beginning of this case started, Pace would receive an update regarding invoices, product listings, and costs associated with best-letting to go ahead and stand behind those products to replace those products in the field. Pace was aware of these products all along. Every quarter, they would receive an update. These are the products. These are the ones that are under the breach of warranty. These are the ones that are failing in the field. This is the cost for our travel to go out and replace these products. And the fact that in 2009, Pace went ahead, and this was almost five years before the actual trial, Pace took the deposition of Sunil Prathi, who was the engineer for best-letting. And at that time, they went through those products. They had every opportunity to ask questions regarding those products and understood that these products were going to be brought up in trial. Why did they understand they would be brought up in trial? It's just because there's discovery going on. I mean, discovery is very broad of anything that may lead to relevant evidence. Basically, it's the standard of discovery. So because they go through a broad discovery process, they should know that there are claims that are not in the complaint that are going to be tried in trial. Is that what you're arguing? No, Your Honor. What I'm arguing is through discovery, there was very specific questions. What products are you presenting for your breach of warranty claim? And we presented this. Here's the list. Why didn't you amend your complaint? If you wish to bring claims that are outside of your complaint, why wasn't there an amendment or an attempt to do that? That is Pace's argument, that we brought these other products. It is not our position that we amended our complaint. You did it, didn't you? No. Why did you not amend it? We didn't believe that we had to because we believed that all these products fell under the whole breach of warranty claim, which is the reason why we did not amend the complaint. Pace has a great way of bringing this up after trial, not during summary judgment. When we went ahead and briefed the entire issue of warranty during summary judgment back in 2013, there was never an issue that these products don't fall within our complaint. If we hold that Pace's breach of contract best invalidated its lands, its lands, pardon me, what situation then does that create for this case and just in that area of the law generally? Did the court find that Pace's breach of contract invalidated, that Pace's breach of contract best invalidated the land that it had in the dispute area? Judge, you're regarding the lien on specific tooling. Right. What the court found was that Pace was the wrongdoer. Pace was the wrongdoer first before they could even go ahead and place a lien onto that specific tooling, and I think that's what the court found. If you were the wrongdoer first, you cannot go ahead and place this lien on these products that you violated the actual contract with. There was evidence that was produced, undisputed evidence, that they used this tooling to produce products, and now they want to go ahead and place a lien on it. But, I mean, you know, the record is pretty clear that in addition to the contested products that they created for themselves with the tooling, they had, in fact, produced product for BESS in accordance with the agreement, right? Yes, Your Honor. So there's no abuse complying with the, I mean, producing products for BESS and on the side for themselves. And on the side for themselves. So is this producing it on the side for themselves sufficient to invalidate any demand that they might otherwise have on the law? And what's the effect of that? I would agree that that lien would be ineffective because of being the wrongdoer by breaching it. I mean, there's no faith going forward on a contract or even having to pay for it if you found that the other side has been, you know, secretly behind you conducting the campaign of, you know, backdooring and selling all of your customers. And even if the breach of contract argument fails, PACE has never fulfilled its obligation under the revised code on the liens. They never went ahead and put forth not one piece of evidence regarding the reported invoice that has left the $893,000 that they claim that they are owed. What product was produced that would be – that PACE is holding this particular tool in? Okay. I'll leave it to my confusion. I thought the district court held that PACE was entitled to that $800,000 that wasn't paid for the products produced. And they did have a valid breach of contract claim for that amount, but then, of course, that amount was set off against these other products. Am I wrong? No, you're – So they did have a valid breach of contract claim, and they were owed that $800,000 for the product. But under Ohio law, if you produce products and you are owed those products, under Ohio law, you're entitled to the lien. Are you not? Yes. And that's what they were trying to enforce. Is that a lien for the contract that wasn't paid? That's likely, Your Honor, to answer the first part of your question. That's likely never disputed that they owe the $893,000. Okay. That itself gives them a lien, does it not? It does not, Your Honor, because – Why not? Because PACE would have to put forth evidence. If it was just one piece of tooling, we'd understand that. If there's one piece of tooling and you owe $893,000, well, then we understand that that one piece of tooling is covered under that $893,000. But a clear reading of the Ohio revised code states that you have to identify what products under the open invoice of $893,000, what products culminate within that $893,000 were used off of that tooling. So you have to go in and – Say all products. Right. And specifically identify or differentiate between the various tools. Here's the invoice for $800,000. The invoice must say what was not paid for. That adds up to be $800,000. And for those, you've got to – PACE did not put forth any of that evidence. Well, there was an invoice somewhere that said there was a pay for it. Absolutely. Okay. But we must specify the product, right? The products? I mean – If it was not put forth in any of – during the eight days of trial in front of court, what products were involved. If we look at it, we can't have a lien on products. If you have a series of tooling that was not even utilized, PACE is going to say, well, we can have a lien on these pieces of tooling, even though they don't cover any of the products that were produced. That is not in line with the Ohio revised code. Okay. This is a problem here that your client – this client – had reached an agreement, formally perhaps, not written. We'll give you this and you'll give us that. And it worked pretty well in the first couple of orders, in the first couple of years. And then these disputes arose, but there were no written contracts. Perhaps they wanted to save on order fees at the beginning. And now we're here with this very complicated series of transactions, nothing except for the wash in writing. Is that a fair summary of how this may have come about? There was beginning trust between the parties that evaporated over the years? Yes, Your Honor, which probably started back in 2003. Okay. So it's about three years after the relationship started. Now there's – But there are requirements under the UCC and Ohio statutes and so on for certain kinds of agreements, certain kinds of warranties and so on, being written. And that just didn't happen here in the way it did in the initial agreement. We had two older business guys that it was based on a handshake all the way throughout. But at the time, when 2006 hit, I think at that point in time there was a lot of concern regarding, you know, is there a settlement of best-selling products in the market? And at that point in time, that's why they required a – if we're going to move over. Is there a coincidence that's also in the bubble with the real estate bubble and the money gap type? No, Your Honor. I'm not sure how that fits in on that. But if we look back at the – I understand you said my Lanham Act claim is weak, but this is an avarice with the Johnson case, where Johnson being an architect, another architect came in, took the architect plans, took the name off of those plans, put their own name on it, and submitted them as their sales. That's exactly what this case is. It's identical to it. Except that we're actually dealing with the products. Well, the architect plans. I mean, would there be some proprietary right to them? I mean, here there is no proprietary right to the product. In fact, my understanding is this product was probably copied from somebody else. And so anybody can produce this. I mean, I don't think it's quite like an architectural plan that originated from a particular person. These are kind of, if I understand it, generic claim textures. There's no patent or copyright. So anybody – I mean, the law right now is anybody can produce this, absent an agreement or absent some sort of law that prohibits it. The presumption is that everybody can produce these types of products. Right? Everyone got that at the right pace based upon the contract and the fact that they were the man who did that. It was not just reverse engineering, as a lot of the landmark cases that we looked at and that we have cited in our brief, where someone took a product and brought it back and reverse engineered it. In fact, as Pace had their assembly line coming along, 10,000 pieces of vests, okay, stop. All right, continue. Now let's put the Pace sticker on it. There's no contract to prohibit that. I mean, it's a law. You know, that behavior is not allowed on the landmark. And then the fact is Mr. Cole brought up the protectability. That has to deal with the trade dress issue. It has nothing to do with the reverse calling on issue, which it was very clear in Judge Sardi's opinion regarding what you need to overcome the basis of origin and confusion that fall within the landmark on reverse calling on. We don't need protectability. All right. I think that satisfies my questions. Judge Sardi. Mr. Barber. Thank you very much. Thank you, Your Honor. Mr. Hall, you've got the phone. Thank you, Your Honor. Working in reverse order, I guess, the court below and Mr. Barber just relied on the Johnson case, which both predates Daystar but also is not comparable in terms of the claim of reverse calling off. It actually meets the Daystar criteria. The architect in that case had two claims. He brought the Lanham Act claim, which was found in his favor in order to award him attorney's fees, but his primary claim for damages was that the taking of his plans breached his copyright. So he had a protectable interest, and the court found that, awarded him damages on the copyright, and then also found that physically taking his plans, erasing his name, and inserting your own name on the physical plans constituted a reverse calling off as well for a protected item. So I think Johnson is completely in line with what Justice Scalia ultimately said in Daystar and also is different than the situation we have here. In terms of our conversion finding and our lien, the details of the sum of the invoices to BESS were not part of the trial because we got summary judgment. BESS was awarded summary judgment on that amount of money at the summary judgment stage. And those, they were exhibits to the motions, but they weren't represented at trial because it was an issue that was already foreclosed. In terms of the trade secrets issue, Mr. Barwell has confused the trade secret that ultimately was found protected versus the design elements that are not. Each and every product may have had a different design to it, but that design is not a trade secret because it's readily available to the public. You take them out of the box, you can see how they're designed, you can see how they attach to the wall. Those are not trade secrets. The trade secret they were claiming is that they taught Pace everything about manufacturing. Well, Pace had learned that by 2004, which is what Judge Sargis found, that that's when the trade secret, if it existed, and we dispute that it existed, but if there was a trade secret, he found there was an actionable position by August of 2004. And it didn't change later if you added more products because the more products would simply change design, which is not protected. So the trade secret issue has to do with the manner of manufacturing and not with the design of the products. There's a lot of claims here, and we haven't talked about all of them, but you're also appealing to the finding of the tortuous interference claim. I find that to be a tough claim for you to appeal. I mean, tell me why this is not tortuous interference. I mean, isn't this classic tortuous interference under a lot of laws? I don't believe it's classic tortuous interference because their proof simply said, we suffered damages as a result of your presence in the market, but that's not what Ohio law provides in terms of proving a tortuous interference claim. Now, we can differentiate between a few products that... What's missing under Ohio law for this to be tortuous interference? Well, I think what's missing is both the wrongful acts, and we don't believe that we violated the contract, which the judge found is the basis for the tortuous interference, and also the fact that they did not identify a relationship to them, to the customer. I mean, they identified four customers that dealt with deliveries that were made in 2007 and said, we had relationships with those customers, and for those products, which amounted to about $600,000 worth of sales, if we're going to argue about tortuous interference, that's the specifics we should be arguing about. To then turn around and say, well, you see, we had relationships with those four, so all of your sales of these products should come under the banner of tortuous interference. Well, that's not what the law provides. The law is much more specific in terms of identifying the customers who... what relationships have been affected. And they failed to do that. And we also believe they failed to show that we are exercised to wrongful means. But that had to do with the breach of contract, which we've disputed throughout. Any further questions? All right, thank you, Mr. Paul. Thank you, Your Honor. The case will be submitted in, I believe, the case is not before the court either today...